Mr. Justice MILLET!
delivered the opinion of the court.
Two grounds are taken in the opinion 6f the circuit judge •and in the argument of counsel for defendant, on which it is insisted that the section of the statute of February 29th, 1872, on which the main reliance is placed to issue the bonds, is unconstitutional.
The first of these is, that by section five of article twelve of the constitution of that State it is declared that provision shall be made by general law for the organization'of cities, towns, aud villages; and their power of taxation, assessment, borrowing money, contracting dents, and loaning their credit, shall be so restricted as to prevent the abuse of such power.
The argument is that the statute in question is void be *659 cause it authorizes cities' and towns to contract debts, and does not contain any restrictión on the power so conferred:' But whether the statute which confers power to contract debts should always contain some limitation or restriction, or whether a general restriction applicable to all cases should be passed, and whether in the absence of both the grant of power to contract is wholly void, are questions whose solu-. lion we prefer to remit to the State courts, ás in this .case. we find ample reason to sustain the demurrer on'the.second ground on which it is argued .by counsel and sustained by the Circuit Court.
That proposition is that the act authorizes the towns and other municipalities to which it applies, by issuing bonds or loaning their credit, to take the property.of the citizen under the guise of taxation to pay these bonds, and' use it in aid of ' the enterprises of others which are not of a public character, thus perverting the right of taxation, which can only be exercised for a public use, to the aid of individual interests and personal purposes of profit and gain.
The proposition as thus broadly stated is not new, nor is the question which it raises difficult of solution.
If these municipal corporations, which áre in fact subdivisions of the State, and which for many.reasons are vested with quasi legislative powers, have a fund or other property out of which they can pay the debts which they contract, without resort to taxation, it may be within the power of the legislature^ the State to authorize them to use it in aid of projects strictly private or personal, but which would in a secondary manner contribute to the public good; oi-where there is property or money vested in a corporation of the kind for a particular use, as public worship or charity, the legislature'may pass laws authorizing them'.to make com tracts in reference to this property, and incur debts pavable from that source.
But such instances are few and exceptional, and the proposition is a very broad one,that-debts contracted by municipal corporations must be paid, if paid at all, out of taxes which' they may lawfully levy, and that all contracts creating *660 debts to be paid in future, not limited to payment from some' other source, imply an obligation to pay by taxation.
It follows that in this class of cases the right to contract, must be limited by the right to tax, and if in the given case no tax can lawfully be levied to pay the debt, the contract itself is void for want of-authority to make it.
If this were not so, these corporations could make valid promises, which they have no means of fulfilling, and on which even the legislature that created them can confer no such power, The validity .of a contract which can only be fulfilled by a resort to taxation, depends on the power to levy the tax for that purpose.*
It is, therefore, to be inferred that when the legislature of the State authorizes a county or city to contract a debt by bond, it intends to authorize-it to levy such taxes as are necessary to pay the debt, unless there is in the act itself, or in some general statute, a limitation upon the power of taxation which repels such an inference.
With these remarks and with the reference to the authorities which support them, we as.sume that unless the legislature of Kansas had the right to authorize the counties and towns in that State to levy taxes to be used in aid of manufacturing enterprises, conducted by individuals, or private corporations, for purposes of gain, the law is void, and the bonds issued under it are also void. We proceed'to the inquiry whether such a power exists in the legislature .of the State of Kansas.
We have already said the question is not new. The subject of the aid voted-to railroads by counties and.towns has been brought to the attention of the courts Qf almost eve'ry State in the Union. It has been thoroughly discussed- and is still the subject of discussion in those courts. It is quite ■true that a decided preponderance of authority.is to be found in favor o'f the proposition that the .legislatures of the States, *661 unless restricted by some special provisions of their constitutions, may confer upon these municipal bodies, the right to take stock in corporations created to build railroads, and to lend their credit to such- corporations. Also to levy the necessary taxes' on the inhabitants,'and on property within their limits subject to general taxation, to enable them to pay the debts thus incurred. But very few of these courts have decided this without a division among the judges of which they were composed, while others have decided against -the existence of the power altogether.*
In all these caáes, however, the decision has turned upon the question whether the taxation by which this aid was afforded to the building of railroads was for a public-purpose. Those who came to the conclusion that it was, held the laws for that purpose valid. Those who could not reach that conclusion held them void. In all the controversy this has been the turning-point of the judgments of the courts. And it is safe to say that no. court has held debts created:in aid of railroad -companies, by counties or towns, valid on any other ground than that the purpose for which the taxes were levied was.- a public use, a purpose or object which it was the right and the duty of State governments' to assist by money raised from the people by taxation.. The argument in opposition to this power has beeu, that railroads built by corporations organized mainly for purposes of gain —the roads which they built being under their control, and not that of the State — were private and not public roads, and-the tax assessed on the people went to swell the profits ' of individuals and not to the good of the State, or the benefit of the public, except in a remote and'collateral way. On the other hand it was- said that roads, canals, bridges, navigable streams, and all other highways had in all times been matter of public concern. That such channels of travel and of.the carrying business had always been established, improved, regulated by the State, and that the railroad had *662 not lost this character because constructed by individual enterprise, aggregated into a corporation.
We are- not prepared to say that the latter view of it is not the true one, especially as there are other characteristics of a public nature conferred on these corporations, such as the power to obtain right-of way, their subjection to the laws which govern common carriers, and the like, which seem to justify the proposition.. Of the disastrous consequences which have followed its. recognition by the courts and which were predicted when it was first established there can be no doubt.
We have referred to this history of the contest over aid to railroads by taxation, to show that the strongest advocates for the validity of these laws never placed it on the ground ■of the unlimited power in the State legislature to tax the people, but conceded that where the purpose for which the tax was to be issued could no longer be justly claimed-to have this public .character, but was purely in aid of private or personal objects, the law authorizing it was beyond the legislative power, and ivas an unauthorized invasion of private right.*
It must be conceded that there are such rights in every free government beyond the control of the State. A government which recognized no súch rights, which held the lives, the liberty, aud the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less.a despotism. It paay well be doubted jf a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness, and the security of which is-essential to that happiuess, under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man-than by many. .
*663 The theory of onr governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers.
There are limitations on such power which grow out of the essential nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name. No court, for instance, would hesitate to declare void a statute which enacted that A. and 13. who were husband and wife to each other should be so no longer, but that A. should thereafter be the husband of C., and 33. the wife of D. Or which should enact that the homestead now owned by A. should no longer be his, but should henceforth be the property of 33.*
Of all the powers conferred upon government that of taxation is most liable to abuse. Given a purpose or object for which taxation may be lawfully used and the extent of its exercise is in its very nature unlimited. It is true that express limitation on the amount of tax. to be levied or the things to be taxed may be imposed by constitution or statute, but in most instances for which taxes are levied, as the support of governnient, the prosecution of war, the National defence, any limitation is unsafe. The entire resources of the people should in some instances be at the disposal of the government.
The power to tax is, therefore, the strongest, the most pervading of all the powers of governinent, reaching directly or indirectly to all classes of the people. It was said by Chief Justice Marshall, in the'case of McCulloch v. The Slate of Maryland,† that the power to tax is the power to. destroy. A .striking instance of the truth of the proposition is seen in the fact that the existing tax of ten per cent, imposed by the United States on the circulation of all other banks than the National banks, drove out of.existence every *664 State bank of circulation within a year or two after its passage. This power'can as readily be employed against one class of individuals and in fervor of another, so as to ruin the one class and give, unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised.
To lay with one hand the power of the government on the property^of the citizen, and. with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms.-
Nor is it taxation. A “ tax,” 'says Webster’s Dictionary, “ is a rate or sum of money assessed-on the person or prop-. erty of a citizen by government for the. use of the nation , or state:” “ Taxes are burdens or charges imposed by the legislature upon persons or property to raise mouey for public purposes.”*
Coulter, J., in Northern Liberties v. St. John’s Church,† says, very forcibly, “ I think the common mind has everywhere taken, in the understanding that taxes are a public‘imposition, levied by authority of the government for the purpose of carrying on the government in all-its machinery atid operations — that they are imposed for a public purpose.”
We have, established, we think, beyoud cavil .that there can be no lawful tax which is not laid for á publie purpose. It may not be easy to draw thedine in all cases so as to decide what is a public purpose in this sense and what is not-.
It is undoubtedly the duty of-the legislature which imposes' or authorizes municipalities to impose % tax to see,that it is not to be used for purposes of private interest instead' of a public use, and the courts can only be justified in interposing when a violation • of this principle is clear and the' *665 reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this Tine,'they must be governed mainly by the course and usage of the government, the objects for which taxes have .been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal. Whatever lawfully pertains to this and is. sanctioned by. time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation.
But in the case before us, in which the towns are authorized to contribute aid by way of taxation to any class of .manufacturers, there is no difficulty in holding that, this is not su£h a public purpose as we have been considering. If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital, or labor. The merchant, the mechanic, the'innkeeper, the banker, the builder, the. steamboat'owner are equally promoters of the public good, and equally deserving the aid of the .citi-' zens by forced contributions. No line can be drawn in favor of the manufacturer wrhich would, not open the coffers' of • the public treasury" to the importunities of two-thirds .of the business men of the city or town. . • ';.
A reference to one or two eases, adjudicated by courts of the highest character will be sufficient, if any authority were heeded, to sustain .us in this proposition. ■
In the case of Allen v. The Inhabitants of Jay,* the town, meeting had voted to loan their credit to the amount o'f $10,000, to'Hutchins and Lane, if they would invest $12,000. in a steam saw-mill, grist-mill, and boxdactory.machinery, to be built in that town by them. There was a provision ■ to secure the town'by mortgage on'the mill, and the seleet *666 men were authorized to issue town bonds for the amount of the. aid so voted. Ten of the taxable inhabitants of the town filed a bill to enjoin the selectmen from issuing the bonds.
. The Supreme Judicial Court of Maine, in an able opinion by Chief Justice Appleton, held that this was not a public purpose, and that the town could levy no taxes on the inhabitants in aid of the enterprise, and could, therefore, issue no bonds, though a special act of the legislature had ratified the vote of the town, and they granted the injunction as prayed lor.
Shortly after the disastrous fire in Boston, in 1872, which laid an important part of that city in ashes, the governor of the State convened the legislative body of Massachusetts, called the General Court, for the express purpose of affording some relief to the city and its people from the sufferings consequent on this great calamity. A statute was passed, among others, which authorized the city to issue its bonds to an amount not exceeding twenty millions of dollars, which bonds were to be loaned, under proper guards for securing the city from loss, to the owners of the ground whose buildings had been destroyed by fire, to aid them in rebuilding.
In the case of Lowell v. The City of Boston, in the Supreme Judicial Court of Massachusetts, the validity of this act was considered. We have been furnished a copy of the opinion, though it is not yet reported in the regular series of that court. The American Law Review for July, 1873, says that the question was elaborately and ably argued. The court, in an able and exhaustive opinion, decided that the law was unconstitutional, as giving a right to tax for other than a public purpose.
The same court had previously decided, in the case of Jenkins v. Anderson,* that a statute authorizing the town authorities to aid by taxation a school established by the will of a citizen, and governed by trustees selected by the will, *667 was void because the school was not under the control of the town' officers, and was not, therefore, a public purpose for which taxes could be levied on the inhabitants.
The same principle precisely was decided by the State court of Wisconsin .in the case of Curtis v. Whipple.* In that case a special statute which authorized the town to aid the Jefferson Liberal Institute was declared void because, though a school of learning, it was a private enterprise not under the control of the town authorities. In the subsequent case of Whiting v. Fond du Lac, already cited, the principle is fully considered and reaffirmed.
These cases are clearly in point, and they assert a principle which meets our cordial approval.
We do not attach any importance to the fact that the town authorities paid one instalment of interest on these bonds. Such a payment works no estoppel. If the legislature was without power to authorize the issue of these bonds, aud its státute attempting to confer such' authority is void, the mere payment of interest, which was equally unauthorized, cannot create of itself a power to levy taxes, resting on no other foundation than the fact that they have ouce been illegally levied for that purpose.
The act of March 2d, 1872, concerning internal improvements, can give no assistance to these bonds. If We could hold that the corporation for manufacturing wronght-irou bridges was within the meaning of the statute, whiel seems very difficult to do, it would- still be liable to the objection that money raised to assist the company was not for a public purpose, as we have already demonstrated.
Judgment aeeirmed.

 Sharpless v. Mayor of Philadelphia, 21 Pennsylvania State, 147, 167; Hanson v. Vernon, 27 Iowa, 28; Allen v. Inhabitants of Jay, 60 Maine, 127; Lowell v. Boston, Massachusetts (MS.); “Whiting v. Fond du Lac, 25 Wisconsin, 188.

 The State v. Wapello Co., 9 Iowa, 308; Hanson v. Vernon, 27 Id. 28; Sharpless v. Mayor, &c., 21 Pennsylvania State, 147; Whiting v. Fond du Lac, 25 Wisconsin, 188.

 Olcott v. Supervisors, 16 Wallace, 689; People v. Salem, 20 Michigan, 452; Jenkins v. Andover, 103 Massachusetts, 94; Dillon on Municipal Corporations, § 587; 2 Redfield’s Laws of Railways, 398, rule 2.

 Whiting v. Fond du Lac, Wisconsin, 188; Cooley on Constitutional Limitations, 129, 175, 487; Dillon on Municipal Corporations, & 587.

 4 Wheaton 431.

 Cooley on Constitutional Limitations, 479.

 13 Pennsylvania State, 104; see also Pray v. Northern Liberties, 31 Id. 69; Matter of Mayor of New York, 11 Johnson, 77; Camden v. Allen, 2 Dutcher, 398; Sharpless v. Mayor of Philadelphia, supra; Hanson v. Vernon, 27 Iowa, 47; Whiting v. Pond du Lac, 25 Wisconsin, 188.

 60 Maine, 124.

 103 Massachusetts, 74.

 24 Wisconsin, 350.